# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-IA-00645-SCT

*MARGARET CORBAN AND MAGRUDER S. CORBAN*

*v.*

*UNITED SERVICES AUTOMOBILE ASSOCIATION a/k/a USAA INSURANCE AGENCY*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2008 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JUDY M. GUICE |
| | CLYDE H. GUNN, III |
| | RICHARD T. PHILLIPS |
| | CHRISTOPHER COLLINS VAN CLEAVE |
| | DAVID NEIL HARRIS, JR. |
| | WILLIAM CORBAN GUNN |
| ATTORNEYS FOR APPELLEE: | CHARLES G. COPELAND |
| | ROBERT P. THOMPSON |
| | ROBERT L. GOZA |
| | JANET G. ARNOLD |
| NATURE OF THE CASE: | CIVIL - PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; REMANDED - 10/08/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Dr. Magruder S. and Margaret Corban ("Corbans") incurred losses caused by physical damage to their Long Beach, Mississippi, residence during Hurricane Katrina on August 29, 2005.  The Corbans had purchased a homeowner's policy and a flood policy from United

Services Automobile Association Insurance Agency ("USAA"), both of which were in force at the time the losses were suffered.

¶2. The Corbans notified USAA of their claim for losses. USAA adjusters inspected the property and obtained an engineering report for an opinion as to whether the losses were caused by "wind damage . . . versus flood damage." Subsequently, USAA informed the Corbans that the majority of the physical damage to their property was the result of flooding and that payment for losses caused by flood, an excluded peril in the homeowner's policy, would not be made under that policy.

¶3. Dissatisfied with USAA's decision, the Corbans filed suit. After answering the Complaint, USAA filed a "Motion for Partial Summary Judgment." Subsequently, the Corbans filed a "Motion for Partial Summary Judgment." The competing motions focused on the ambiguity, *vel non*, of the "water damage" exclusion and the "anticoncurrent cause" ("ACC") clause contained in the homeowner's policy, *inter alia*. The Corbans further asserted that if the policy language was determined to be unambiguous, then the provisions, when read together, were contrary to Mississippi public policy.

¶4. Following a hearing, the Circuit Court of Harrison County, Mississippi, First Judicial District, entered an "Order Granting Partial Summary Judgment to [USAA] and Denying Partial Summary Judgment to [the Corbans] Regarding Anticoncurrent Causation Clause and Storm Surge Issues (With Findings of Fact and Conclusions of Law)." The circuit judge found that "storm surge" is an "excluded peril" within the "water damage definition of the subject policy"; that the "water damage" exclusion and ACC clause are "unambiguous"; and that, although expressing a contrary interpretation of the policy language, "the anticoncurrent

2

causation clause will be applied herein as interpreted by the United States Fifth Circuit Court of Appeals, thereby barring coverage under the homeowner's policy for any damage caused by water as defined in the policy or caused concurrently or sequentially by wind and water in combination." The Corbans sought an interlocutory appeal of these rulings, which this Court granted.[1] *See* Miss. R. App. P. 5.

**FACTS**

¶5. The Corbans had resided on East Beach Boulevard, Long Beach, Mississippi, several hundred feet from the Mississippi Gulf Coast,[2] since 1988. The subject property was insured by two policies, a homeowner's policy and a flood policy,[3] each procured from USAA. The insured property included a two-story dwelling, multi-car garage, guest cottage, gazebo, and potting shed, among other structures. Significant damage was wrought upon the Corbans' real and personal property during Hurricane Katrina, causing significant losses. The Corbans filed a claim seeking indemnity for their losses, in the amount of $1,607,926.

---

[1]Amicus curiae briefs were filed by United Policyholders; Mississippi Attorney General Jim Hood; Nationwide Mutual Fire Insurance Company and Nationwide Property and Casualty Company ("Nationwide"); Allstate Property and Casualty Insurance Company; and the National Association of Mutual Insurance Companies and State Farm Fire and Casualty Company. Given the extraordinary impact of the resolution of these issues on citizens of this state and the insurance industry, this Court granted the motions of the Attorney General and Nationwide seeking leave to participate in oral argument as amicus curiae. *See* Miss. R. App. P. 29(d). The oral argument webcast can be found online at http://lawwin2k3.mc.edu/videoarchive/video.asp?dn=2008-IA-00645-SCT.

[2]The location of the Corbans' home is more accurately described as being on the Mississippi Sound. *See* National Oceanic and Atmospheric Administration, http://www.noaa.gov (last visited October 6, 2009).

[3]While issued by USAA, the flood policy was provided through the National Flood Insurance Program.

3

¶6.    USAA assigned Chris Sims and Joe Howell to adjust the Corbans' claim. According to Howell, Sims retained an engineer to inspect the property because "[w]e were using engineers on large, significant losses to help determine whether there was wind damage . . . versus flood damage." Paul R. William, P.E., and Jim D. Wiethorn, P.E., of Haag Engineering Company ("Haag") inspected the property. Howell testified that no engineering report was necessary for a flood-policy claim as "it's obviously total flood damage in excess of the [flood] policy limit . . . ."

¶7.    In October 2005, the Corbans received $250,000, the limit of liability for loss to the dwelling under the flood policy. Thereafter, the Corbans received an additional $100,000, the limit of liability for loss to contents under the flood policy. The Corbans also received $4,000 under the homeowner's policy for loss of jewelry, watches, furs, and silverware, and $1,900 under the homeowner's policy for refrigerated food losses.

¶8.    In early 2006, Howell received the Haag report, which attributed all damage to "the first story living area to flooding and wave wash." After receiving the report, Howell inspected the property. Howell "determined what was to be paid on the wind loss[,]" relying on the Haag report and "[m]y observations of the loss and looking at the house and the damage that presented itself." Howell attributed none of the first-floor damage to wind, concluding that payment to the Corbans was limited to "replac[ing] the cottage roof and . . . replac[ing] the roof and some fascia repair and paint around the main house[,]" as well as for power washing and a "repair allowance" on the gazebo and the potting shed.[4]

---

[4]Experts subsequently employed by the Corbans contend that the home and other structures were destroyed by wind before the "storm surge" arrived.

¶9. In January 2006, the Corbans received $39,971.91 under "Coverage A - Dwelling" and "Coverage B - Other Structures" of the homeowner's policy for losses USAA attributed to wind damage. The Corbans also received $16,955.38 under the homeowner's policy for additional living expenses incurred. In February 2006, USAA issued a letter to the Corbans, stating that, based upon the Haag report, "[i]t was determined that the majority of the damage to your home was the result of flooding. Unfortunately, flood is an excluded peril in your HO-3 Homeowners Policy[5] and payment cannot be made for these damages." The Corbans finally received a payment of $21,077 under the homeowner's policy for personal property insured under a "personal articles floater." Thus, the Corbans received a total of $433,903.77 ($350,000 under the flood policy and $83,903.77 under the homeowner's policy), leaving $1,174,022.23 in claimed losses unsatisfied.

¶10. The Corbans filed suit based on a variety of contract and tort theories.[6] According to the Complaint, "USAA marketed, packaged, presented, and sold the subject [homeowner's] policy to the Corbans in such a manner as to cause them to believe they had coverage under the subject policy for all damages that could be caused by a hurricane." The Corbans contended, *inter alia*, that the "water damage" exclusion and accompanying ACC clause, when considered "with the policy's intent to provide coverage for hurricane losses, are ambiguous as a matter of law." USAA answered and affirmatively pleaded "that certain of

---

[5]This statement references the "water damage" exclusion, *see* ¶ 23 *infra*.

[6]The parties subsequently agreed to bifurcate the Corbans' claims for "insurance coverage/breach of contract from their claims for extracontractual emotional distress damages, attorneys fees and expenses, and punitive damages."

the damages . . . were the result of water damages as defined in the policy. Such damages are excluded under 'Section I - Exclusions, 1.c.(1).'"

¶11.   USAA later filed a "Motion for Partial Summary Judgment," asserting, *inter alia*, that:

   (1)   Storm surge is flood and is an excluded peril under the water damage exclusion.
   (2)   The [Corbans] are judicially estopped from denying that the insured structures and contents were damaged by flood at least to the extent of the amount paid under the flood insurance policy.
   (3)   The wind and hail deductible (incorrectly referred to by [the Corbans] as "a hurricane deductible endorsement") does not affect the policy provisions.
   (4)   The [Corbans'] claims for misrepresentation by USAA or its agents is without merit because the policy is not ambiguous and the provisions pertaining to covered and excluded perils are plainly stated.

The Corbans then filed a "Motion for Partial Summary Judgment," maintaining that the ACC clause in the policy should be invalidated as ambiguous and contrary to Mississippi public policy, such that "Plaintiffs are entitled to judgment as a matter of law . . . ." USAA responded that "the ACC clause contained in [the] policy is unambiguous and should be enforced as written."

¶12.   Following a hearing, the circuit court conducted a conference with counsel to discuss its rulings prior to entry. During that conference, the Corbans stated their intention to seek an interlocutory appeal. USAA agreed that such was appropriate. The circuit court then entered an "Order of Continuance and Stay" providing that "trial of this cause is hereby continued and the case is stayed pending entry of orders of the Court . . . and interlocutory appeal thereof."

¶13.   Relevant to the disposition of this appeal, the circuit court entered an "Order Granting Partial Summary Judgment to Defendant and Denying Partial Summary Judgment to

6

Plaintiffs Regarding Anticoncurrent Causation Clause and Storm Surge Issues (With Findings of Fact and Conclusions of Law)." The circuit judge found "storm surge" to be within the "water damage definition . . . and . . . , therefore, an excluded peril." The circuit judge further found that the "water damage" exclusion and ACC clause were "unambiguous." Finally, the circuit judge concluded that "the anticoncurrent causation clause will be applied herein as interpreted by the United States Fifth Circuit Court of Appeals, thereby barring coverage under the homeowner's policy for any damage caused by water as defined in the policy or caused concurrently or sequentially by wind and water in combination."

¶14. The Corbans' "Petition for Interlocutory Appeal" followed entry of the aforementioned order, and was granted by this Court.

## ISSUES

¶15. On interlocutory appeal, the Corbans identified the following issues:

1. Is the water damage exclusion purporting to exclude concurrent or sequential contributing causes ambiguous and therefore void as to hurricane losses where multiple courts and parties have struggled for years and are unable to determine what the language means and how it affects Hurricane Katrina losses?

2. If construed to exclude losses caused by wind merely because water later impacted the property or to alter contract law requiring an insurer to prove what part of the loss was caused by an excepted event, does the water exclusion violate Mississippi public policy in the context of hurricane claims?

3. In an "all risk" homeowner's policy containing an anti-concurrent cause clause as part of its exclusion, which party – the insurance company or the insured – must establish causation on that part of the loss that is excluded?

7

4. Did not the Fifth Circuit Court of Appeals err in its "*Erie*-guess"[7] in *Leonard*[8] and *Tuepker*[9] that under Mississippi insurance contract law "indivisible damage" caused by both wind and water in a hurricane is excluded under the contract terms of the homeowner's policies at issue?

5. Does the USAA insurance policy preclude recovery for hurricane loss where the efficient proximate cause is a covered event?

6. Did the trial court err in its interpretation of the anti-concurrent cause clause?

No cross-appeal was filed by USAA.

¶16. After due consideration, this Court restates, and will consider only, the following issues:[10]

(1) Whether the circuit court erred in finding that "storm surge" is included in the "water damage" exclusion.
(2) Whether the circuit court erred in finding that the ACC clause is applicable in the case *sub judice*.
(3) Which party bears the burden of proof.

**ANALYSIS**

¶17. Our analysis begins by focusing on the wording of the policy,[11] which is the subject of this dispute. We have examined the policy to discern the meaning of its words and

---

[7]*See **Erie R.R. v. Tompkins**, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).

[8]*See **Leonard v. Nationwide Mut. Ins. Co.**, 499 F.3d 419 (5th Cir. 2007).

[9]*See **Tuepker v. State Farm Fire & Cas. Co.**, 507 F.3d 346 (5th Cir. 2007).

[10]*See **Mayor and Bd. of Aldermen, City of Ocean Springs v. Homebuilders Ass'n of Miss.**, 932 So. 2d 44, 60 (Miss. 2006) (declining to address an issue, "[a]s the other issues were case dispositive[.]").

[11]Excerpted portions of the policy packet, with emphasis provided by this Court, are attached. *See* Appendix.

8

sentences and to assure the accuracy of our determinations. We have perused the disputed clauses, scrutinized the use of the same words in clauses in other provisions of the policy not subject to dispute, and, finally, consulted standard and legal dictionaries for definitions of words not defined within the policy. Our role is to render a fair reading and interpretation of the policy by examining its express language and applying the "ordinary and popular meaning" to any undefined terms. *Noxubee County Sch. Dist. v. United Nat'l Ins. Co.*, 883 So. 2d 1159, 1165 (Miss. 2004) (citing *Blackledge v. Omega Ins. Co.*, 740 So. 2d 295, 298 (Miss. 1999)). Once accomplished, we apply that reading to the specific issues presented to this tribunal, for a determination of whether the disputed clauses apply, *vel non*, to the losses for which the Corbans seek indemnity.

¶18. "The interpretation of an insurance policy is a question of law, not one of fact." *Noxubee County*, 883 So. 2d at 1165 (citing *Lewis v. Allstate Ins. Co.*, 730 So. 2d 65, 68 (Miss. 1998)). "[W]hen a question of law is raised, we apply a de novo standard of review." *Delashmit v. State*, 991 So. 2d 1215, 1218 (Miss. 2008) (citation omitted).

¶19. In Mississippi, insurance policies:

> are contracts, and as such, they are to be enforced according to their provisions. When parties to a contract make mutual promises (barring some defense or condition which excuses performance), they are entitled to the benefit of their bargain. Thus, insurance companies must be able to rely on their statements of coverage, exclusions, disclaimers, definitions, and other provisions, in order to receive the benefit of their bargain and to ensure that rates have been properly calculated.

*Noxubee County*, 883 So. 2d at 1166 (citations omitted). *See also Simmons v. Bank of Mississippi*, 593 So. 2d 40, 42-43 (Miss. 1992) (quoting *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987)) ("[a] court must effect a determination of the meaning of

the language used, not the ascertainment of some possible but unexpressed intent of the parties."). "[I]n interpreting an insurance policy, this Court should look at the policy as a whole, consider all relevant portions together and, whenever possible, give operative effect to every provision in order to reach a reasonable overall result." *J&W Foods Corp. v. State Farm Mut. Auto. Ins. Co.*, 723 So. 2d 550, 552 (Miss. 1998) (citing *Cont'l Cas. Co. v. Hester*, 360 So. 2d 695, 697 (Miss. 1978)).

¶20. The substantive contract law of this state likewise has been clearly declared by this Court to include the following concepts:

> if a contract is clear and unambiguous, then it must be interpreted as written. . . . If a contract contains ambiguous or unclear language, then ambiguities must be resolved in favor of the non-drafting party. Ambiguities exist when a policy can be logically interpreted in two or more ways, where one logical interpretation provides for coverage. However, ambiguities do not exist simply because two parties disagree over the interpretation of a policy. Exclusions and limitations on coverage are also construed in favor of the insured. Language in exclusionary clauses must be "clear and unmistakable," as those clauses are strictly interpreted.

*United States Fid. & Guar. Co. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008) (internal citations omitted). *See also* *Frazier v. N. Miss. Shopping Ctr., Inc.*, 458 So. 2d 1051, 1054 (Miss. 1984) ("[a] construction leading to an absurd, harsh or unreasonable result in a contract should be avoided unless the terms are express and free of doubt.").

¶21. It is undisputed that the policy provides "all-risk" coverage as to "Coverage A - Dwelling" and "Coverage B - Other Structures," such that "direct physical loss" caused by any risk (i.e., peril(s)) not expressly excluded is covered. USAA concedes that "[t]his means that all risks to the structures are covered, other than those risks specifically excluded from coverage." It is likewise undisputed that the policy provides only "named-perils" coverage

10

as to "Coverage C - Personal Property," such that only "direct physical loss" caused by a listed peril is covered, unless such *loss* is expressly excluded. The Corbans concede that the policy provides only "named perils" coverage as to "Coverage C - Personal Property." Finally, it is undisputed that the provision excluding "water damage" loss, which includes the ACC clause, excludes loss, not perils.

¶22. Regarding pertinent coverage and exclusions, there is no dispute that under Coverages A, B, and C, any loss caused by wind is covered, while any loss caused by "water damage," as defined, is excluded.[12] USAA provided the following example:

> if an insured's roof is breached and rainwater comes in, damaging a carpet, USAA pays for rainwater damage to the carpet. This is so, even if storm surge subsequently breaches the walls of the house and floods it, destroying the carpet. USAA would still owe for drying and cleaning the carpet to repair the rainwater damage. It would not owe for a replacement carpet, since the destruction of the carpet resulted from excluded storm surge flooding.[13]

### 1. Whether the circuit court erred in finding that "storm surge" is included in the "water damage" exclusion.

¶23. The policy expressly excludes, in pertinent part, "[w]ater damage, meaning: (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind . . . ." The Corbans maintain that "storm surge" is a covered peril because "[t]he policy itself defines 'water damage' and purposely does not include

---

[12]The Corbans contest whether the "water damage" exclusion includes "storm surge." *See* Issue I *infra*.

[13]Amicus Nationwide disavows USAA's interpretive application and advances a more stringent interpretation. Nationwide argues that USAA's position "wind[s] up paying a homeowner to dry and clean a carpet that no longer exists because it was completely destroyed by floodwater."

11

storm surge within that definition."  USAA responds that "storm surge" is obviously an "excluded peril" under the "water damage" exclusion.

¶24.    The circuit court ruled that:

> [a]ll of the sources reviewed by this [c]ourt refer to storm surge as ocean or lake water being pushed by or affected by wind causing the water to rise and move toward or onto shore.  Many of these sources refer to this surge as combining with the normal tides or as causing a rising of sea level.  Certainly by these definitions, storm surge could be considered surface water, waves, tidal water, or even overflow of a body of water.  Storm surge is included in the policy terminology delineating the meaning of "water damage" by virtue of its definition. [*Leonard*] and [*Tuepker*], and cases cited therein also found that "storm surge" is included in such a definition.  The lack of the words "storm surge" do[es] not either render the provision ambiguous or provide coverage for storm surge.

¶25.    "Storm surge is a phenomenon associated with hurricanes.  Atmospheric conditions and wind forces combine to force tidal waters ashore and temporarily inundate areas of normally dry land."  *Leonard v. Nationwide Mut. Ins. Co.*, 438 F. Supp. 2d 684, 692 (S.D. Miss. 2006).  In *Leonard* and *Tuepker*, both the United States district court and the Fifth Circuit found that "storm surge" was included within comparable "water damage" exclusions.[14]  *See Tuepker*, 507 F.3d at 353; *Leonard*, 499 F.3d at 436-38; *Leonard*, 438 F. Supp. 2d at 693; *Tuepker v. State Farm Fire & Cas. Co.*, 2006 WL 1442489, at *3 (S.D. Miss. 2006) (affirmed in part; reversed in part and remanded by *Tuepker*, 507 F.3d at 346). *See also Dickinson v. Nationwide Mut. Fire Ins. Co.*, 2008 WL 941783, at *6 (S.D. Miss.

---

[14]The policy in *Leonard* excluded "[w]ater or damage caused by water-borne material."  *Leonard*, 499 F.3d at 424.  That phrase was defined, in pertinent part, as "1. flood, surface water, waves, tidal waves, overflow of a body of water, spray from these, whether or not driven by wind."  *Id*.

12

2008); ***Buente v. Allstate Prop. & Cas. Ins. Co.***, 2006 WL 980784, at \*1-2 (S.D. Miss.

2006).[15]  In ***Leonard***, the Fifth Circuit held that:

> [c]ourts have interpreted water-damage exclusions like the one found in the Leonards' policy to encompass the peril of wind-driven inundation by water, or storm surge for ages.  Mississippi courts have upheld such exclusions before and after Hurricane Katrina. . . .  Further, this court's most recent consideration of the term "flood" also supports Nationwide's contention that the term is unambiguous and has a concrete meaning, whether or not used in the context of an insurance policy.  *See **In re Katrina Canal Breaches Litigation***, 495 F.3d 191, 2007 U.S. App. LEXIS 18349, 2007 WL 2200004, at \*16-18 (5th Cir. 2007) . . . .  No decision of this court or any other of which we are aware endorses the Leonards' view that storm surge is a unique meteorological phenomenon not contemplated by water-damages exclusions like Nationwide's. . . .
>
> The phrase "storm surge" is little more than a synonym for a "tidal wave" or wind-driven flood, both of which are excluded perils.  The omission of the specific term "storm surge" does not create ambiguity in the policy regarding coverage available in a hurricane and does not entitle the Leonards to recovery for their flood-induced damages.

***Leonard***, 499 F.3d at 437-38 (footnotes omitted).

¶26.    We affirm the circuit court's ruling that "storm surge" is contained unambiguously

within the "water damage" exclusion.  This Court finds that "storm surge" is plainly

---

[15]The referenced federal court decisions are not binding upon this Court, but merely persuasive.  *See **Bullard v. Guardian Life Ins. Co.***, 941 So. 2d 812, 819 n.1 (Miss. 2006).

encompassed within the "flood" or "overflow of a body of water" portions of the "water damage" definition, and no other "logical interpretation" exists. *Martin*, 998 So. 2d at 963.

**2. Whether the circuit court erred in finding that the ACC clause is applicable in the case *sub judice*.**

**A.**

¶27. The circuit judge first stated that "[a] plain common sense reading of the policy, without resort to legal jargon or theories, would seem to be the proper means to interpret provisions in an insurance policy that average citizens are expected to read and understand." The circuit judge then deemed the "water damage" exclusion and ACC clause to be "unambiguous," observing that:

> [u]sing the simple rules learned in middle school or high school English classes, the exclusion provides that it does not cover a loss caused by water damage. The second sentence refers to "[s]uch loss" being excluded even if in combination with or in any sequence to other causes. The term "[s]uch loss" can only refer to the loss caused by water damage mentioned in the first sentence of the exclusion. It is that loss and that loss only that is excluded by the plain language of the provision. The remainder of the second sentence goes on to elaborate on the exclusion by providing that the water damage is excluded no matter what other causes exist and whether the water damage occurs first, last, or simultaneously with some other cause. This simple, basic interpretation of the language used and sentence structure used bars coverage for water damage and only the water damage, whether occurring alone or in any order with another cause.

Notwithstanding, the circuit court concluded that its analysis of the language:

> will not be substituted for that of the only appeals court precedent available on this issue. Further, it is not clear that the appeals courts of Mississippi would decline to adopt the analyses and decisions of the Fifth Circuit in this regard. The decisions of the Fifth Circuit will, therefore, be applied in this case. The Corbans' motion seeking partial summary judgment on the issue of the applicability of the ACC clause will be denied. Pursuant to *Leonard* and *Tuepker*, the ACC clause will be applied herein. The Corbans may not

14

recover for any damage caused by water as defined in the policy or a combination of that water and wind.[16]

That ruling set the stage for this appeal, i.e., a fair reading and interpretation of the policy in issue by this Court.

¶28.   The ACC clause reads:

### SECTION I - EXCLUSIONS

1.   We do not insure for *loss* caused directly or indirectly by any of the following.   Such *loss* is *excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss*.

(Emphasis added.)  The terms "loss," "concurrently," and "in any sequence" are pertinent to our inquiry.  The policy lends limited assistance to this endeavor, as it fails to define those terms.  Thus, "those words are afforded their ordinary and popular meaning."  ***Noxubee County***, 883 So. 2d at 1165.  Additionally, the use of these terms elsewhere in the policy can assist our inquiry.  *See* ***Martin***, 998 So. 2d at 963 (citing ***J&W Foods Corp.***, 723 So. 2d at 552) ("[a] policy must be considered as a whole, with all relevant clauses together.").

### *"Loss"*

¶29.   We first observe that the parties and trial court in this proceeding, as well as other courts in cases cited, have conflated the terms "loss" and "damage."  A "loss" is incurred by an insured and typically, but not always, follows "damage" to his or her property.[17]

---

[16]*See* ***Tuepker***, 507 F.3d at 354 ("the ACC clause in combination with the Water Damage Exclusion clearly provides that indivisible damage caused by both excluded perils and covered perils or other causes is not covered."); ***Leonard***, 499 F.3d at 430 ("[t]he only species of damage covered under the policy is damage caused exclusively by wind.  But if wind and water synergistically caused the same damage, such damage is excluded.").

[17]An example of loss in the absence of direct physical damage can be found in the "Credit Card, Fund Transfer Card, Forgery, and Counterfeit Money" provisions of the

15

"Property damage" is defined within the policy as "physical damage to, or destruction of tangible property, including loss of use of this property." *See* Appendix. The policy does not cover or exclude "damage," but rather covers or excludes "loss," and it is to "loss" that the deductible is applied.

¶30. With "loss" undefined in the policy, we look for its "ordinary and popular meaning." *Noxubee County*, 883 So. 2d at 1165. Elsewhere, "loss" has been defined as "1. An act or instance of losing. 2. One that is lost. 3. Injury or suffering caused by losing or by being lost." Webster's II New College Dictionary 647 (3d ed. 2001). *See also* Bryan A. Garner, *A Dictionary of Modern Legal Usage*, 538 (2d ed. 1995) (to "lose" is "to suffer the deprivation of; to part with."); Black's Law Dictionary 54 (4th ed. 1968) ("actual loss" is defined as "[o]ne resulting from the real and substantial destruction of the property insured.").

¶31. Based upon policy usage and the "ordinary and popular meaning," *Noxubee County*, 883 So. 2d at 1165, we find that loss occurs at that point in time when the insured suffers deprivation of, physical damage to, or destruction of the property insured. This determination is likewise consistent with "Loss Settlement" provisions of the homeowner's policy, which grant USAA the option of settling "[c]overed property losses" by paying the insured "the *cost* to repair or restore the property to the condition it was in *just before the loss*." *See* Appendix (emphasis added). Similarly, within the "Replacement Cost Coverage - Personal Property" section of the homeowner's policy, "replacement cost" is defined as "the

---

policy. Additionally, stolen items qualify as losses, even though property is not "physically damaged."

*cost, at the time of loss . . . .*"  *Id.* (emphasis added).  Additionally, the "Loss Settlement" portion of the "Special Coverage on Jewelry, Watches, Furs, and Silverware" establishes the "*value* of the covered property" as being "*set at the time of loss or damage.*"  *Id.* (emphasis added).

¶32.    No reasonable person can seriously dispute that if a loss occurs, caused by either a covered peril (wind) or an excluded peril (water), that particular loss is not changed by any subsequent cause or event.  Nor can the loss be excluded after it has been suffered, as the right to be indemnified[18] for a loss caused by a covered peril attaches at that point in time when the insured suffers deprivation of, physical damage to, or destruction of the property insured.  An insurer cannot avoid its obligation to indemnify the insured based upon an event which occurs subsequent to the covered loss.[19]  The insured's right to be indemnified for a covered loss vests at time of loss.  Once the duty to indemnify arises, it cannot be extinguished by a successive cause or event.  *See **Bland v. Bland***, 629 So. 2d 582, 589 (Miss. 1993) ("[b]enefits *vest* under a casualty policy when the event occurs . . . .") (emphasis added); ***Pitts v. Am. Sec. Life Ins. Co.***, 931 F.2d 351, 358 (5th Cir. 1991) ("[s]ince the policy . . . was in full force at the time Pitts was injured, his benefits under the policy *vested*.") (emphasis added).  The same principle applies in reverse.  In the case of a loss caused by an excluded peril, that particular loss is not changed by any subsequent covered peril or event.  Nor can that excluded loss become a covered loss, after it has been suffered.

---

[18]For purposes of this opinion, "indemnity" means "[s]ecurity or protection against contingent hurt, damage, or loss . . . ."  Garner, *A Dictionary of Modern Legal Usage* at 437.

[19]Absent a breach of policy conditions by the insured, e.g., engaging in concealment or fraud relating to the insurance.

17

¶33.    "Loss to property can consist of *many losses* because property can consist of *many elements*, and 'loss' need *not* refer *only* to the *totality of the damage* and in fact *should not when different forces have caused different damage*."  Appleman on Insurance § 192.03[H] (2009) (emphasis added).  The subject homeowner's policy insures "for direct, physical loss" to property.   Following the policy language and the principles enumerated herein, the Corbans are entitled to recover for all covered "direct, physical loss[es]" to the property,[20] not otherwise excluded.

*"Concurrently"*

¶34.    A hurricane includes a number of weather conditions, elements, and/or forces, at times acting dependently, at other times independently.[21]  USAA argues that this policy excludes losses caused by perils which may coexist.  We examine the policy to determine if this

---

[20]Under Coverages A, B, and C, the "Perils Insured Against" section of the homeowner's policy provides coverage "for direct, physical *loss to the property* . . . ." (Emphasis added.)

[21]The subject homeowner's policy does not expressly provide or exclude coverage for a hurricane.  As such, this Court agrees with the circuit court that the "wind and hail" deductible in the homeowners policy, *see* Appendix, "does not . . . create any ambiguity with regard to any of the other issues . . . by this [c]ourt.  Nothing in the terms of the deductible affects the ACC clause or the water damage exclusion."  The "wind and hail" deductible makes no reference to being a "hurricane deductible."  In fact, the term "hurricane" is found nowhere in the homeowner's policy.  Therefore, this Court summarily concludes that the Corbans' claims and argument to the contrary are without merit.
    The subject homeowner's policy does not expressly provide or exclude coverage for a hurricane.  As such, Katrina was neither the covered nor excluded cause or event.  Rather, the perils unleashed by Katrina were the covered or excluded causes or events.  Courts and litigants likewise have conflated cause or event with covered and excluded perils, just as the terms "damage" and "loss" have been conflated.  *See* ¶ 29 *supra*.  The argument of amicus Nationwide exemplifies the fallacy of the "hurricane-as-covered-event" proposition *vis-a-vis* the USAA policy.  *See* ¶ 46 *infra*.

assertion is supported by its language. Before that determination can be made, we must render a fair reading and interpretation of the express language "concurrently."

¶35.   The term "concurrently" is defined as "1. Occurring at the same time.  2. Operating in conjunction.  3. Meeting or tending to meet at the same point: Convergent."  Webster's II New College Dictionary at 234.  *See also* Black's Law Dictionary at 363 (defining "concurrent" as "[r]unning together; . . . acting in conjunction; . . . contributing to the same event; contemporaneous").

¶36.   Thus, the exclusion applies only in the event that the perils act in conjunction, as an indivisible force, occurring at the same time, to cause direct physical damage resulting in loss. In that event, we accept the Fifth Circuit's interpretation of Mississippi law, and would apply the ACC clause to exclude coverage.

¶37.   However, the facts presented in the case *sub judice* do not reveal a claim by either party that an "indivisible" force (wind and flood), occurring at the same time, caused direct physical damage resulting in simultaneous loss to the property. Based upon the record as it now stands, and as presented by both parties, the subject perils acted in sequence, not concurrently, i.e., at different times, causing different damage, resulting in separate losses. It is only when the two perils converge at the same point in time, contemporaneously and operating in conjunction, that there is a "concurrent" cause or event. If the wind peril causes damage resulting in a loss either before or after the water peril ("flood") causes damage resulting in a loss, the losses are *not* "concurrent." Only if it can be proven that the perils (wind and flood) contemporaneously converged, operating in conjunction to cause loss, that

19

the "concurrent" provision will apply. In that circumstance, the policy clearly excludes coverage.

*"In Any Sequence"*

¶38. This Court interprets the term "in any sequence" to mean "sequentially." The term "sequentially" is defined as "1. Forming or marked by a sequence, as of notes or units." Webster's II New College Dictionary at 1008. *See also* Garner, *A Dictionary of Modern Legal Usage* at 795 ("'[s]equential' means 'forming a sequence or consequence.'").

¶39. "If a contract contains ambiguous or unclear language, then ambiguities must be resolved in favor of the non-drafting party. . . . Exclusions and limitations on coverage are also construed in favor of the insured. Language in exclusionary clauses must be 'clear and unmistakable,' as those clauses are strictly interpreted." **Martin**, 998 So. 2d at 963. Relatedly:

> [w]here the policy is subject to two interpretations, equally reasonable, that which gives the greater indemnity to the insured will prevail. If one construction, looking to the other provisions of the policy, and to its general object and scope, would lead to an unreasonable result, such construction must be abandoned, and that construction adopted which will be more consistent with reason. In all cases the policy must be liberally construed in favor of the insured, in order to accomplish the purpose of the insurance.

**Southern Home Ins. Co. v. Wall**, 156 Miss. 865, 127 So. 298, 299 (1930).

¶40. The term "in any sequence" is contained within an exclusionary clause for "water damage" losses. The term is undefined in the policy. As "loss occurs at that point in time when the insured suffers deprivation of, physical damage to, or destruction of the property insured[,]" *see* ¶ 31 *supra*, this term cannot be used to devest an insured's right of indemnity for a covered loss, as such an interpretation conflicts with other provisions of the USAA

20

policy. For instance, "Section I - Conditions" regarding "Insurable Interest and Limit of Liability" provides that, "in any one loss," USAA will not be liable "for more than the amount of the *insured's interest at the time of loss* . . . ." *See* Appendix (emphasis added). Moreover, "Section I - Conditions" regarding "Loss Settlement" states that USAA has the option of paying "the *cost to repair or restore* the *property to* the *condition* it was in *just before the loss*." *Id*. (emphasis added). Additionally, the "Replacement Cost Coverage - Personal Property" section states that "*[r]eplacement cost* means the *cost, at the time of loss* . . . ." *Id*. (emphasis added). Finally, the "Loss Settlement" provision within the "Special Coverage on Jewelry, Watches, Furs and Silverware" section provides that "[t]he *value* of the covered property . . . will be *set at* the *time of loss or damage*[,]" and that USAA has the option of paying "*the cost to repair or restore the property to the condition it was in just before the loss*." *See id*. (emphasis added).

¶41.    These provisions irreconcilably conflict with the "in any sequence" language, thereby creating an ambiguity. Our precedent requires this Court to construe an "equally reasonable" interpretation in favor of the nondrafting, insured party (the Corbans). *Wall*, 127 So. at 299. Therefore, this Court concludes that the "in any sequence" language in the policy may not be used to devest the insureds of their right to be indemnified for covered losses. *See Martin*, 998 So. 2d at 963; *Wall*, 127 So. at 300 (if "[t]he two clauses of the policy are so conflicting that they cannot stand together – one must give way to the other; and, under the principles stated, the provision most favorable to the insured must be upheld.").

21

**B.**

¶42.   As aptly stated by the circuit judge, "simple rules learned in middle school or high school English classes" dictate that the ACC clause applies only to losses caused by "water damage." As such, with respect to the "water damage" exclusion, based upon the factual scenario presented to this Court, we conclude that the ACC clause should be read as follows:

**SECTION I - EXCLUSIONS**

> 1. We do not insure for *loss* caused directly or indirectly by [water damage]. Such loss [from water damage] is excluded regardless of any other cause or event [wind damage] contributing concurrently or in any sequence to the loss [from water damage].

(Emphasis added.)  *See also **Dickinson v. Nationwide Mut. Fire Ins. Co.**, 2008 WL 1913957, at \*3-4 (S.D. Miss. 2008).

¶43.   In assessing the applicability, *vel non*, of the ACC clause, we reiterate that different perils from a hurricane generally, but not without exception, result in separate damage and loss. The policy establishes a duty to indemnify for covered "direct physical losses" under Coverages A, B, and C. The ACC clause applies only if and when covered and excluded perils contemporaneously converge, operating in conjunction, to cause damage resulting in loss to the insured property. If the insured property is separately damaged by a covered or excluded peril, the ACC clause is inapplicable. If damage is caused by a covered peril, the insured is entitled to indemnification for the covered loss, as the insured's right to recover for the loss has vested. *See **Bland***, 629 So. 2d at 589; ***Pitts***, 931 F.2d at 358. Conversely, if the damage is caused by an excluded peril, the insured is not entitled to indemnification for that uncovered loss.

22

¶44.   Based on the evidence thus far presented, the same loss with multiple causes is not at issue here.  Thus, a finder of fact must determine what losses, if any, were caused by wind, and what losses, if any, were caused by flood.  If the property suffered damage from wind, and separately was damaged by flood, the insured is entitled to be compensated for those losses caused by wind.  Any loss caused by "[flood] damage" is excluded.  If the property first suffers damage from wind, resulting in a loss, whether additional "[flood] damage" occurs is of no consequence, as the insured has suffered a compensable wind-damage loss.  Conversely, if the property first suffers damage from flood, resulting in a loss, and then wind damage occurs, the insured can only recover for losses attributable to wind.

¶45.   In *Dickinson*, the federal district court astutely found that "any loss in which the excluded peril of flooding plays no part is outside 'the loss' to which the ACC applies." *Dickinson*, 2008 WL 1913957, at *2.  This Court finds the analysis of the federal district court in *Dickinson* to be salient:

> the damage done by *wind* and *wind-driven debris* during Hurricane Katrina is a loss that is covered by the Nationwide homeowners policy, and any additional damage done by the rising waters incident to the storm is not a covered loss.  In this situation, *the anti-concurrent cause provision is not applicable* and does not come into play because each force causes its own separate damage independent of the damage caused by the other even when the same item of property is damaged by both forces acting separately and sequentially. Wind and water are separate and not concurrent causes of the damage to the insured property.

*Dickinson*, 2008 WL 941783, at *6 (emphasis added).

¶46.   We conclude that the ACC clause has no application for losses caused by wind peril. An insurer may not abrogate its duty to indemnify for such loss by the occurrence of a subsequent, excluded cause or event, a position advanced by amicus Nationwide.  According

23

to Nationwide, the loss occurred in the same event, which they contend was the hurricane. Nationwide unconvincingly posits that loss is not determined until the hurricane is over.[22] Nationwide contends that any loss which the "storm surge" would have caused anyway is excluded. Such an interpretation fails to consider the common understanding of "loss," and would avoid payment for covered "losses," an unreasonable result. Such an interpretation is contradicted by the principle that all "[e]xclusions and limitations on coverage are . . . construed in favor of the insured." *Martin*, 998 So. 2d at 963.

¶47.     The parties to this action agree that the ACC clause has no application to different losses caused by different perils. This Court finds that within the context of this case, under Coverages A, B, and C, any loss caused by damages resulting from wind is a covered loss, while any loss caused by damages resulting from the "storm surge" is an excluded loss. Applying the "ordinary and popular meaning[,]" *Noxubee County*, 883 So. 2d at 1165, of the terms "loss," "concurrently," and "in any sequence," the ACC clause is inapplicable. We are in accord with the district judge in *Dickinson*, who stated:

> *[i]t is clear to me that storm surge flooding cannot be a cause (directly or indirectly) of damage that occurs before the storm surge flooding reaches the insured property, i.e. before the excluded peril of flooding occurs. . . .*
>
> *Wind damage that precedes the arrival of the storm surge and damage that happens after the storm surge arrives are separate losses from separate causes, and not concurrent causes or sequential causes of the same loss*[.] . . .

---

[22]The fallacy of the "hurricane-as-covered-event" position lies both in the absence of the term "hurricane" within the subject policy and the fact that the duration of the hurricane often extends over several days.

*Wind damage that precedes flood damage happens in a sequence of events, but the wind damage is not caused, directly or indirectly, by storm surge flooding, and the damage done by the wind is therefore not a part of "the loss" the ACC refers to.* Since the ACC does not apply to this separate wind damage, the wind damage is a covered loss. The insurance benefits that apply to this covered loss vest in the insured at the time the loss occurs. *See* [*Pitts*, 931 F. 2d at 351; *Bland*, 629 So. 2d at 582]. Wind and flood were separate and not concurrent causes of damage to the insured property, and the wind damage that precedes the storm surge does not contribute, sequentially or concurrently, to "the [excluded] loss" caused by storm surge flooding and referred to by the ACC.

*Dickinson*, 2008 WL 1913957, at *2-4 (emphasis added).

¶48. After a thorough examination of Mississippi caselaw, the evidence presented to date in this case, the briefs of the parties and amici, and the USAA policy at issue, this Court declares the ACC clause inapplicable. We respectfully reject the proposition that, under the subject ACC clause, "*indivisible*[23] *damage caused by both* excluded perils and covered perils or other causes is not covered."[24] *Tuepker*, 507 F.3d at 354 (emphasis added). We neither agree nor find support for an analysis focusing on "damage" rather than "loss," or the premise that "storm surge" flooding which inundates the same area that the wind, acting independently, previously damaged constitutes "indivisible damage" or "the same damage . . . ." *See Tuepker*, 507 F.3d at 354; *Leonard*, 499 F.3d at 431. Only when facts in a given

---

[23]The term "indivisible" is found nowhere in the subject homeowner's policy.

[24]We can agree, but not without clarification, that "if wind and water *synergistically caused the same damage*, such damage is excluded." *Leonard*, 499 F.3d at 430 (emphasis added). However, this Court is troubled by the conflation of the terms "damage" and "loss," and the use of the term "synergistically." "Synergism" is defined as "[t]he action of two or more substances, organs, or organisms to achieve an effect of which each is individually incapable." Webster's II New College Dictionary at 1118. The policy does not require the insurer to establish synergistic damage, only concurrent loss. "Synergism," like "indivisible," is found nowhere in the policy, and may be ill-suited for the wind/flood disputes of hurricane claims, generally, and the ACC clause at issue, specifically.

case establish a truly "concurrent" cause, i.e., wind and flood simultaneously converging and operating in conjunction to damage the property, would we find, under Mississippi law, that there is an "indivisible" loss which would trigger application of the ACC clause. Neither the parties nor amici in the case *sub judice* have offered a factual basis to support a "concurrent" cause here.

¶49. We conclude that the circuit judge correctly interpreted the ACC clause, but then erred in applying the Fifth Circuit's "***Erie***-guess" regarding its application. The ACC clause is inapplicable here. All "direct physical losses" under Coverages A, B, and C which are caused by wind are covered. All "direct physical losses" under Coverages A, B, and C which are caused by "[flood] damage" are excluded. Any "[flood] damage" losses to which a covered peril (in this case, wind) "contribut[ed] concurrently" are excluded. As this presents issues of fact for jury determination, we next consider the applicable burden of proof.

### 3. Which party bears the burden of proof.

¶50. The parties agree that the subject policy provides "all-risk" coverage as to "Coverage A - Dwelling" and "Coverage B - Other Structures." "The purpose of an 'All-Risk' policy is to insure losses when the cause of the loss is unknown or the specific risk was not explicitly contemplated by either party." Lee R. Russ & Thomas F. Segalla, 7 Couch on Insurance § 101:7 (3d ed. 2007). Under such coverage, "the insured has the initial burden to prove that the loss occurred." *Id*. Thereafter, the burden shifts to the insurer, as "[i]n an all-risk . . . policy where an exclusion is specifically pleaded as an affirmative defense the burden of proving such affirmative defense is upon the insurer . . . ." ***Lunday v. Lititz Mut. Ins. Co.***, 276 So. 2d 696, 698 (Miss. 1973). *See also **Morrison Grain Co. v. Utica Mut. Ins.***

26

***Co.***, 632 F.2d 424, 430 (5th Cir. 1980) ("[i]t would seem to be inconsistent with the broad protective purposes of 'all risks' insurance to impose on the insured . . . the burden of proving the precise cause of the loss or damage."). USAA offers that:

> as to the "all risk" dwelling and other structures coverage, once the Corbans demonstrate a direct, physical loss to their property, USAA bears the burden to prove by a preponderance of the evidence that any part of the damage it excluded from coverage was caused or contributed to by storm surge flooding.

USAA further acknowledged that it does not contest the existence of such "direct, physical loss" under "Coverage A - Dwelling" and "Coverage B - Other Structures." Finally, with respect to "indeterminable" loss under the "all-risk" coverage of "Coverage A - Dwelling" and "Coverage B - Other Structures," USAA also concedes coverage.

¶51. This Court finds that with respect to the "all-risk" coverage of "Coverage A - Dwelling" and "Coverage B - Other Structures," the Corbans are required to prove a "direct, physical loss to property described." Thereafter, USAA assumes the burden to prove, by a preponderance of the evidence, that the causes of the losses are excluded by the policy, in this case, "[flood] damage." USAA is obliged to indemnify the Corbans for all losses under "Coverage A - Dwelling" and "Coverage B - Other Structures" which USAA cannot establish, by a preponderance of the evidence, to have been *caused* or *concurrently contributed to* by "[flood] damage." "Contributed to" comes into play only when "[flood] damage" is a cause or event *contributing concurrently* to the loss. Pursuant to the policy language, only if proof of a "concurrent" cause is presented to a jury for consideration would the jury receive an instruction including the policy phrase "contributing concurrently." Likewise, striking the proper balance, under "Coverage C - Personal Property," discussed

27

in ¶¶ 52-53 *infra*, the plaintiff must prove that the loss was caused by a peril insured against, not "caused or contributed to." Upon proper instruction, these determinations are for a jury. *See Grace v. Lititz Mut. Ins. Co.*, 257 So. 2d 217, 224 (Miss. 1972).

¶52. The parties likewise agree that the subject policy separately provides "named perils" coverage as to "Coverage C - Personal Property." Under "named perils" coverage, the burden of proof rests with the insured "to prove that the damages sustained were covered by the peril insured against . . . ." *Lunday*, 276 So. 2d at 699. *See also* Appleman on Insurance at § 192.09 (under "named peril" coverage, "the insured has the burden of proving that any losses were caused by a peril covered by the policy – indemnity is not available unless the loss falls under one of the specifically enumerated coverages."); Russ & Segalla, 7 Couch on Insurance at § 101:7 ("'[n]amed perils' . . . policies provide coverage only for the specific risks enumerated in the policy and excludes all other risks.").

¶53. We find that with respect to the "named perils" coverage of "Coverage C - Personal Property," the Corbans are required to prove, by a preponderance of the evidence, that the "direct physical loss" to the property described in Coverage C was caused by wind. This is likewise a question of fact for the jury. *See Grace*, 257 So. 2d at 224.

## CONCLUSION

¶54. Accordingly, the circuit court did not err in ruling that "storm surge" is included in the "water damage" exclusion. However, the circuit court erred in holding that the ACC clause is applicable in the case *sub judice*. Therefore, the "Order Granting Partial Summary Judgment to [USAA] and Denying Partial Summary Judgment to [the Corbans] Regarding Anticoncurrent Causation Clause and Storm Surge Issues (With Findings of Fact and

28

Conclusions of Law)" is affirmed in part and reversed in part, and this case is remanded for further proceedings consistent with this opinion. Moreover, as there are questions of fact for jury resolution, we set forth the burden of proof borne by each party under Coverages A, B, and C.

¶55.     **AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**

*Appendix*

**HOMEOWNERS POLICY PACKET** [p. 1]

. . .

**IMPORTANT MESSAGES**

. . .

3) PLEASE NOTE: *This policy DOES NOT cover the peril of Flood*. The Federal Government has requested we notify you that coverage for Flood is available from the National Flood Insurance Program through USAA Flood Operations. If you do not already have a Flood Policy and would like information, call Flood Operations at 1-800-531-8444.

. . .

**Coverages and Limits of Liability**

| **Section I.** | A. Dwelling | $750,000 |
| | C. Personal Property | $562,500 |
| | D. Loss of Use (Up to 12 Months) | $150,000 |

. . .

**Deductibles (Section I Only)**

*We cover only that part of the loss* over the deductible stated.

| Wind and Hail | $7,500 | (1%) |
| All Other Perils | $1,000 | |

. . .

| DD | HO-48 | (04-93) | Increased Limits for Other Structures | $180.00 |
| DD | HO-506 | (04-93) | Special Coverage - Jewelry, Furs, Silver | $32.00 |
| DD | HO-728 | (06-97) | Replacement Cost Coverage | $792.33 |

. . .

**INCREASED LIMITS ON OTHER STRUCTURES** [p. 7]

For an additional premium, we cover the following structures described below on the residence premises for the additional limit of liability shown.  This is additional insurance for these structures.

. . .

| Description of Structure | Additional Limit of Liability | Premium |
|---|---|---|
| Gar, Pool House, Toilet Fax | $60,000 | $180.00 |

. . .

## SPECIAL COVERAGE ON JEWELRY, WATCHES, FURS AND SILVERWARE
[p. 8]

For an additional premium, *we insure against risks of direct loss to property* listed below only *if that loss is a physical loss* to the property.  *We do not insure losses excluded* in Exclusions below.

. . .

**Limit of Liability**          $4,000

. . .

**Loss Settlement**.  The *value of* the covered *property* is not agreed upon but *will be set at the time of loss or damage*.

. . .

1.  It is our option to:

. . .

b.  pay you the *cost to repair or restore* the *property to* the *condition* it was in *just before the loss*.

If you do not wish to have the property replaced, repaired or restored, we will pay you the smaller of:

. . .

d.  The *cost to repair or restore* the *property to* the *condition* it was in *just before the loss*.

. . .

**REPLACEMENT COST COVERAGE - PERSONAL PROPERTY** [p. 9]

. . .

**Replacement Cost Coverage Defined**

*Replacement Cost* means the *cost, at the time of loss*, of a new item identical to the one damaged, destroyed or stolen.

. . .

**SPECIAL FORM - HOMEOWNERS POLICY**
**\*\*Read Your Policy Carefully\*\***

This policy is a legal contract between you, the policyholder, and us, the insurer. . . . This contract consists of the Declarations page, the policy, and any applicable endorsements.

. . .

The policy itself sets forth, in detail, the rights and obligations of both you and your insurance company.

IT IS THEREFORE IMPORTANT THAT YOU READ YOUR POLICY.[25]

. . .

**AGREEMENT** [p. 1]

In return for payment of premium and subject to all terms of this policy, we will provide the insurance described.

**DEFINITIONS**
. . .

4. "Insured location" means:
a. the residence premises;

---

[25]Dr. Corban testified that he had read the homeowners policy.

b. the part of other premises, other structures and grounds used by you as a residence;

. . .

6. "*[P]roperty damage" means physical damage* to, or *destruction of tangible property*, *including loss of use of* this *property*.

. . .

### SECTION I - PROPERTY COVERAGES [p. 2]

### COVERAGE A - Dwelling

We cover:

1. the dwelling on the residence premises shown in the Declarations, including structures attached to the dwelling . . . .

. . .

### COVERAGE B - Other Structures

We cover other structures on the residence premises set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

. . .

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A.[26]

. . .

### COVERAGE C - Personal Property

. . .

---

[26]In this instance, ten percent of $750,000 is $75,000. As the Corbans also purchased an "Increased Limits for Other Structures" endorsement for an "additional limit of liability" of $60,000, the coverage for "Coverage B - Other Structures" totals $135,000.

**COVERAGE D - Loss of Use**

. . .

1.  **Additional Living Expenses**.  If a loss covered under Section - I makes that part of the residence premises where you reside not fit to live in, we cover the necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

. . .

### SECTION I - PERILS INSURED AGAINST [p. 6]

**COVERAGE A - Dwelling and**
**COVERAGE B - Other Structures**

*We insure against risks of direct, physical loss to property* described in Coverages A and B; *however, we do not insure against loss*:

. . .

4.  *excluded under SECTION I - EXCLUSIONS*.

. . .

**COVERAGE C - Personal Property**
*We insure for direct physical loss to the property* described in Coverage C *caused by peril listed below unless the loss is excluded in SECTION I - EXCLUSIONS*.

1.  Fire or lightning.

2.  *Windstorm* or hail.

*This peril does not include loss to the property contained in a building caused by rain*, snow, sleet, sand or dust *unless the direct force of wind* or hail *damages the building* causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

. . .

### SECTION I - EXCLUSIONS [p. 8]

34

1.  *We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.*

. . .

c. *Water damage, meaning*:

(1) *flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind . . . .*

. . .

2. *We do not insure against loss consisting of any of the following.  Nor do we insure for loss that results when one or more of the following combines with other causes, events or conditions that are also excluded or excepted in this policy*.  However, *any loss that ensues* from the following, *that is not otherwise excluded or excepted is covered*:

. . .

## SECTION I - CONDITIONS [p. 9]

1.  **Insurable Interest and Limit of Liability**. . . . [W]e will *not* be *liable in any one loss*:

a.  to the insured *for more than the amount of the insured's interest at the time of loss . . . .*

. . .

3.  **Loss Settlement**.  Covered property losses are settled as follows:

. . .

It is our option to:

     (a) pay you the actual cash value; or

. . .

     (c) *pay* you the *cost to repair or restore the property to* the *condition* it was in *just before the loss.*

(Emphasis added.)